Argued October 10, affirmed December 10, 1918.

## BOULBY *v.* COLUMBIA CONTRACT CO.*
(176 Pac. 422.)

**Negligence—Dangerous Premises—Jury Question.**

1.   In an action for personal injury, caused by defendant's alleged negligence in not sufficiently guarding a path used by the public for many years, next to which defendant had made a deep and dangerous excavation, evidence *held* sufficient to take the case to the jury.

[As to land owner's liability to persons injured by dangerous premises, see note in 31 Am. St. Rep. 524.]

From Columbia: GEORGE R. BAGLEY, Judge.

Department 2.

The plaintiff alleges that the defendant is an Oregon corporation engaged in operating a rock quarry and mill within the city limits of St. Helens in Columbia County, and owning certain lots on Hemlock Street;

---

*Authorities discussing the question of liability for dangerous condition of private grounds lying open beside a highway or frequented path are collated in notes in 26 L. R. A. 686 and 5 L. R. A. (N. S.) 733.                                                                    REPORTER.

that leading from the business section of St. Helens westerly over and across the premises of the defendant to the Columbia County Lumber Company's sawmill and the St. Helens Creosoting Company's plant there was a certain well-defined and traveled footpath or trail which for many years had constantly been used by the public in passing to and from said localities and over and across the premises of the defendant, with the full knowledge, consent and approval of the defendant. It is further alleged that in operating its quarry previous to the accident the defendant had recently excavated along the south side of the footpath or trail all of the rock and earth in Hemlock Street, to a distance of within a very few feet of said trail and at certain points thereon within less than three or four feet, and to a depth of forty feet, with a perpendicular and precipitous bank adjacent to the trail; that at such points the trail is steep; that at a place thereon about twenty-eight feet from the street line the excavation extends to within three feet of the trail; that by reason thereof the trail became exceedingly unsafe to the traveling public; that the defendant knew of the dangerous condition of the trail which was caused by its own recent excavation; that it was its duty to use reasonable or ordinary care to safeguard the public from the danger of falling into said excavation while passing along and over said trail; that the defendant negligently and carelessly failed and neglected to take any precautions to erect any safeguard or to warn the public and those using the trail, of its dangerous condition or to maintain any fence, guard or railing between the edge of the bluff and the trail or to erect or maintain any sign to give warning of its dangerous condition and knowingly and carelessly maintained a dangerous, unguarded excavation and pathway; that the plaintiff was an able-bodied laborer; that on or about December 1, 1916,

while rightfully traveling upon the path or trail in a careful, cautious and prudent manner, about 5:30 A. M., by reason of the dangerous, unsafe and unguarded condition of the trail and excavation and the negligent acts and omissions of the defendant, plaintiff fell into said excavation and suffered serious injuries; that the negligent acts and omissions of the defendant were the proximate cause of his injuries.

The defendant filed an answer, admitting the ownership of the property at the place where the accident happened as alleged in the complaint, and that while going across the property of the defendant plaintiff fell and received his injuries, but denying all other allegations of the complaint. For a further and separate answer defendant alleges that at the time of his injuries the plaintiff was not in the employ of the defendant but was performing certain work in the city of St. Helens and was going from his home to the city, about 5:30 A. M.; that it was then very dark; that plaintiff had no light or other means of ascertaining where he was walking while going over the trail; that by reason thereof he fell into the rock quarry of the defendant; that near the place where the accident occurred and at the time thereof, the defendant had posted notices upon its property warning all persons against trespassing thereon; that the plaintiff had no right to be upon the premises and was a trespasser; that the defendant did not owe any duty to the plaintiff; that the plaintiff proceeded without any right and was guilty of negligence contributing to his injury; that he failed to give any care or attention as to where he was going or to carry any light to guide his footsteps; that his injuries were the result of an unavoidable accident and due to the negligence of the plaintiff in trespassing upon defendant's property when it was dark, and without any light.

The reply traverses all of the material allegations of the answer. A trial was had and the jury returned a verdict in favor of the plaintiff for the sum of $4,500, upon which judgment was entered and from which the defendant appeals. There are seven different assignments of error, but the defendant apparently relies upon the failure of the court to sustain its motions for nonsuit and for a directed verdict.   AFFIRMED

For appellant there was a brief over the name of *Messrs. Wilbur, Spencer & Beckett,* with an oral argument by *Mr. Schuyler C. Spencer.*

For respondent there was a brief and an oral argument by *Mr. Glen R. Metsker.*

JOHNS, J.—1. Under exhaustive instructions all of the material issues were fully and fairly submitted to the jury and the only question to be decided on this appeal is whether or not there is sufficient evidence to sustain the verdict.

John Hugh Gage testified that for about fourteen years he had been familiar with the premises "around about the quarry up there"; that the trail leads from St. Helens up towards Milton Creek; that he had used the trail while "working at the little mill, and to and from the quarry, * * going up in the morning and coming back at night"; that for six days in the week at morning and night the laborers that worked in the little mill used the trail; that he worked there in the winter; that "it was twenty minutes past six when I got home." In answer to the question, "Did you travel in the dark?" he replied, "I did a good many times; I didn't carry a lantern." Extracts from his testimony follow:

"Q. Which one of the two trails would be the one which people would naturally follow, or easiest to get over?

"A. The one which Mr. Boulby used because it was dry. * *

"Q. This old sign you saw, was there anything on that warning anyone to keep off the premises?

"A. It said danger from blasting.

"Q. That is all that was on it?

"A. Yes, sir.

"Q. Now, where that fence crossed the trail did you put any gate there or anything else for people to walk through?

"A. A plank over the fence.

"Q. How long did you maintain it there?

"A. Until the fence was there. * *

"Q. You took out the stiles and fenced it on both sides and left it open there?

"A. Yes, sir."

E. E. Quick testified that he had lived at St. Helens for about thirty-two years; was county school superintendent for two terms, county clerk for three terms and county treasurer for two terms; that he had known the trail for about thirty-five years; that "in those days it was used quite frequently by various residents of the town going back and forth to Milton Creek and up to Warren." Quick gave further testimony as follows:

"Q. Do you know what route they take when they go to and from St. Helens?

"A. They usually follow that trail. * *

"Q. Boulby didn't have to come that way?

"A. I don't know as he would have to. It is probably a shorter route for him to come that way."

Magnus Saxon testified that he had lived in Columbia County for thirty-three years and for the last eight years at St. Helens, "right up on the bluff there"; that he had traveled the trail since 1884; and that "we used to come into town to get our mail here; that is the only

postoffice we had was at St. Helens.'' His testimony continued thus: .

''Q. When you first traveled that trail how many persons would you say had occasion to use it?·

''A. All of us would travel—used to use that trail when we came on foot. * *

''Q. Did he [one Miles] stop the travel or was there a gate put there?

''A. There was a gate and they rocked them. They still kept the path; they had a stile there. * *

''Q. During the time you have known that trail has it been a well-defined trail?

''A. Oh, yes; I have traveled it over thirty years myself. When I worked down town here I used to walk from here home and I always took that trail because it was the shortest cut. * *

''Q. How much farther would it be for him to come if he took that road instead of that trail by that bluff, any farther? * * How much farther would you say?

''A. Maybe six hundred or seven hundred feet at least.''

U. S. Despain testified that he had lived at St. Helens for about twenty-five years; that he had known the trail for about fifteen years; that one winter he worked for the mill company and used the trail all of the time. He testified further:·

''One summer about sixty worked for Mr. Phillips up there and they all traveled it * * twice a day.

''Q. State whether or not that trail is a well-defined trail.

''A. It always has been ever since I have known it.

''Q. Has it ever been closed since you have known it?

''A. No, sir. * * A few years ago when the people were working at the little mill and the block-maker's there was fifty or sixty or maybe a hundred people traveling it each day. That was three or four years ago. * *

''Q. This route that he took you say is the most practical route?

"A. Yes, sir. * *

"Q. These other trails other than the one that Boulby traveled, are they open?

"A. I don't know of any other trails.

"Q. What is the character of the other trails than through these canyons?

"A. The country is broken and brushy. It is a broken country, several canyons running up through, and water in the slough, and there is several lakes in there.

"Q. At 5:50 o'clock on December the 1st, last year, would it be possible for a man to find his way down through that country?

"A. Not very well; no, sir. * *

"Q. So as a sensible, hard-headed man you would go down by this bluff on this trail and take your chances of falling over that bluff?

"A. Of course the trail had been there so long and people are used to traveling it and the trail is dry and the wagon road would be awful muddy at that time; he could see better out there in the light; that is the fact."

Samuel C. Knighton testified that he was seventy years old; that he had lived at St. Helens "the greater part of the time since he was born"; that he had known the trail for sixty-five years; that he had traveled it frequently; that to the best of his recollection the trail had been used by the public all of that time. We quote from his testimony:

"Q. I will ask you whether or not the trail and route that Mr. Boulby traveled on the morning that he met with his accident is the most direct and practical road between his home and the St. Helens Lumber Company plant in St. Helens?

"A. It surely was. * *

"Q. State whether or not you are able to say that is the identical place where the trail was located in early days.

"A. That is the identical trail that I traveled when I was a boy."

T. C. Watts testified that he was seventy years of age and had lived in Columbia County for sixty-three years; that he had held official positions for about sixty years; that he first went over the trail on December 7, 1852; that the place where Boulby fell is very near where the old trail was: Regarding the trail he said, "In the '50's I traveled it every Friday."

The plaintiff testified that he left his home about 5:45 on the morning of the accident; that "it wasn't dark, a man could see where he was going, plain enough." He further testified:

"I never carried a lantern and there was no occasion for it. * * There was no occasion for a light that morning, it was clear as a bell.

"Q. You have seen those trespass signs out there, have you?

"A. No, sir; they were not there at that time. I know there was no signs on that bluff at all.

"Q. During the time that you traveled that trail did you ever meet Mr. Gensman and his boys?

"A. Yes, sir; I would come through there and go home with Mr. Gensman and his boys.

"Q. Did he know you were traveling the same trail?

"A. Yes, sir.

"Q. Did he ever make any objections to your traveling it?

"A. No, sir.

"Q. State whether or not that is the most practical and direct route from your place.

"A. It is; yes, sir. It is the nearest cut I have got.

"Q. Prior to this morning had you ever encountered any fogs in coming through there?

"A. No, sir. * *

"Q. Just about how long this last time had you been working for the St. Helens Lumber Company?

"A. Ten months.

"Q. During that ten months had there been any excavations by the quarry people that came closer to the path?

"A. Not at this end.

"Q. In the same condition all the time?

"A. Yes, sir.

"Q. How long did you live over there where you did live before you got hurt? -

"A. About five years.

"Q. And you have practically traveled that trail all that time?

"A. Yes, sir."

George Gensman, as a witness for the defendant, testified that he was superintendent or foreman of the defendant and was "put in charge four years ago last February."

We quote from his testimony:

"Q. What was the condition along there? Was there a kind of bluff there or anything?

"A. A steep bluff, approximately like that along there where it has not been disturbed. It was higher there than here I think.

"Q. What made this path along the bluff there? What made that, and how was it made?

"A. By men traveling over it.

"Q. What men?

"A. Principally our men; and after we were established everybody went over there after the trails were cut open; everybody that did business up in that country went over there. * *

"Q. Do you know what one of the various trails is used the most to get from where Boulby lives over to town?

"A. The trail from where Boulby lives over this way; people coming that way used to travel that he came over, that came from that direction. * *

"Q. Do you come over the same trail that Boulby comes over when he comes?

"A. Yes, sir.

"Q. Do you carry a lantern?

"A. I don't carry a lantern, but I carry a flash-light.

"Q. Did you have your flash-light this morning, do you remember?

"A. I don't remember. I don't think I did. * *

"Q. How long have you lived there?

"A. Something about six years; between six and seven years.

"Q. And you have been working at the quarry here all that time?

"A. Yes, sir.

"Q. And during all of that time you have traveled that same trail Boulby travels?

"A. Yes, sir.   There has been a few minor changes made in it, but practically the same trail.

"Q. That is the route you always took?

"A. Yes, sir."

Carl Anand, a witness for and employee of the defendant, testified as follows:

"Q. You say you knew that Boulby used that trail when he was working there?

"A. I have seen him coming over several times.  * *

"Q. You have seen people traveling over that trail frequently while you were working there?

"A. I wouldn't say frequently.   I have seen several people pass over there.

"Q. Each week and day?

"A. Yes, sir; I do.

"Q. Did you see women and children pass over there?

"A. I seen them one day passing over there.

"Q. It is very easy for people working around the premises there to see people as they walk by?

"A. The place I was working there it was; yes, sir."

The testimony tends to show that the defendant had excavated the bluff within about three feet of the trail; that the pit was about forty feet in depth and that the wall where the accident happened was almost perpendicular.   On the morning of the accident the plaintiff left his home at the usual time; the weather was clear and he did not need any light.   About the time that he reached the point in the trail from which he fell, a heavy blanket of fog suddenly arose, which obscured his view, as a result of which he lost his path and in searching for the trail he fell over the bluff, sustaining

the injuries upon which the complaint is based.   There is no claim or pretense that there was any guard or railing along the rim of the bluff and the testimony is clear that the defendant knew that the trail was in general use by the public.   The defendant's foreman testified that he used the trail in going to his work in the early morning and that he knew that the plaintiff used it.   He also testified that he never carried a lantern and seldom used his flash-light.

All of the material questions of fact were fully covered by the instructions.   It also appears from the record that the jury viewed the premises.   We agree with the trial court that it is a close question, but, all things considered, we are of the opinion that there was sufficient evidence to take the case to the jury, and the judgment should be affirmed.                          Affirmed.

McBride, C. J., and Bean and Olson, JJ., concur.